**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **DAMON WILSON** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. WGC-16-425** |
| ) | |
| **PRINCE GEORGE'S COUNTY,** ) | |
| **MARYLAND,** *et al.* ) | |
| ) | |
| **Defendants.** ) | |

## CORRECTED MEMORANDUM OPINION

On December 11, 2014, in the Circuit Court for Prince George's County, Maryland, Plaintiff Damon Wilson filed a six count Complaint against Defendants Prince George's County, Maryland and Patrolman First Class ("PFC") Brendan Gill, alleging negligence, intentional infliction of emotional distress, battery, respondeat superior, unconstitutional custom and practice, and violations of Articles 24 and 26 of the Maryland Declaration of Rights, arising from an October 7, 2012 shooting. On January 29, 2016 Plaintiff amended[1] his Complaint by asserting a claim of excessive force under 42 U.S.C. § 1983. On February 16, 2016 this matter was removed from the Circuit Court for Prince George's County, Maryland to this court. By the consent of the parties, on August 15, 2016, this matter was reassigned to the undersigned for all further proceedings and the entry of judgment. *See* ECF No. 26. Pending before the court and ready for resolution is Defendants' motion for summary judgment (ECF No. 29). Plaintiff filed a response in opposition (ECF No. 30) and Defendants filed a reply (ECF No. 31). No hearing is deemed necessary and the court now rules pursuant to Local Rule 105.6 (D. Md. 2016).

---

[1] This "*Amended*" Complaint is entitled "Second Amended Complaint." *See* ECF No. 35 at 1. To this court's knowledge, Plaintiff filed a Complaint and a Second Amended Complaint. There is no record of an Amended Complaint. Nonetheless, the court will refer to the Second Amended Complaint as the "Amended Complaint."

## **BACKGROUND**

On October 7, 2012 Damon Wilson ("Wilson") exchanged text messages with his ex-girlfriend, Mynia Johnson ("Johnson"), asking to see his two daughters. He then called and spoke with Johnson. They had a disagreement about something. Wilson decided to visit Johnson's residence. It was late in the afternoon. Upon arriving at Johnson's apartment, Wilson knocked and banged on the door. Receiving no response, Wilson shouted that he wanted to see his older daughter who called out to him. Upon hearing his daughter's voice, Wilson was touched. He was also mad and kicked down the front door to the apartment.

Wilson then walked into the apartment cursing in general and specifically at one of Johnson's male guests. Wilson walked toward the back of the apartment, located Johnson and cursed at her. He took time to greet his older daughter. Realizing he was becoming too angry, Wilson left the apartment.

Johnson followed Wilson. She berated him about his conduct. Feeling provoked, he slapped her. According to Wilson, he apologized. In response Johnson said she will call the police. Wilson snatched Johnson's cell phone which fell down the drain. Wilson left the scene and walked to his twin brother's home.

Upon returning to her apartment Johnson called the police. PFC Gill was the first patrolman to respond to the scene regarding a domestic incident. PFC Gill intended to wait for backup but Johnson saw the arrival of his patrol car and met PFC Gill outside the apartment building. She reported her ex-boyfriend broke into her apartment, struck her and left the building. Johnson offered to show the damaged door to PFC Gill who agreed since Wilson had left the scene. PFC Gill followed Johnson to her apartment and verified the damage to the door. PFC Gill then asked Johnson to accompany him to the patrol car to complete paperwork.

Meanwhile, when Wilson arrived at his twin brother's place, his brother was busy tattooing someone. Wilson wanted to discuss what occurred between him and his ex-girlfriend but his brother was preoccupied. Annoyed that he could not speak with his brother, Wilson noticed and grabbed a pocket knife and then ran out the door.

In his emotionally charged state, Wilson wanted to kill himself. He wanted to commit suicide in front of Johnson to let her know she was at a fault for his action. Wilson thus started walking back to Johnson's apartment.

As Wilson walked around the corner of a distant building in the direction of Johnson's building, he saw her with a police officer. Johnson saw Wilson and advised PFC Gill, who directed Johnson to return to her apartment. PFC Gill then walked along the pathway toward the apartment building.

According to PFC Gill, he attempted to engage in a conversation with Wilson. PFC Gill observed Wilson pull an object, something shiny, from his pocket. Initially PFC Gill was too far away from Wilson and could not identify the object. PFC Gill drew his gun and started giving Wilson verbal commands. As Wilson moved closer to him, within 40 feet, PFC Gill realized Wilson was holding a knife. PFC Gill then apprised the dispatcher of the situation and requested assistance. At this point, according to PFC Gill, Wilson stopped walking. Wilson stated he was not going to drop the knife, told PFC Gill to go away, and let him (Wilson) do what he wanted to do. PFC Gill responded no, that he is not going anywhere. Again he commanded Wilson to drop the knife.

Meanwhile Johnson did not leave the scene as instructed. She stood behind PFC Gill. Her boyfriend and another individual became aware of what was happening and joined Johnson.

According to Wilson, once PFC Gill realized he was holding a knife, PFC Gill, with gun drawn, commanded Wilson to stop. Wilson complied and stood approximately 20 feet away. Wilson began cursing, stabbing himself with the knife, yelling, and crying. Wilson did not threaten, either verbally or physically, the police officer. The police officer told Wilson to put the knife down. Wilson continued poking himself with the knife.

According to PFC Gill, he continued giving verbal commands to Wilson to drop the knife. He tried to reason with Wilson who did not comply. Instead Wilson cut his throat, and continued walking. Then he stabbed himself in the chest. Wilson was closing the distance between himself and PFC Gill. Johnson and two other individuals were standing behind PFC Gill, who was standing in front of an apartment building door. If he retreated any further, Wilson could flee by running inside of an apartment.

As a result of stabbing himself in the chest, Wilson stumbled forward, taking four little steps. PFC Gill fired his service weapon five times. According to Wilson, he was approximately 20 feet away when the shots were fired. According to PFC Gill, Wilson was 10 to 15 feet away. According to Johnson, Wilson stood 8 feet away from PFC Gill and 9 to 10 feet away from her.

## JURISDICTION AND VENUE

This court has original jurisdiction pursuant to 28 U.S.C. § 1331[2] as to the excessive force claim under 42 U.S.C. § 1983 (Civil action for deprivation of rights). The remaining counts are claims under the laws of the State of Maryland. Pursuant to 28 U.S.C. § 1367(a), "district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." The court finds the state claims are in fact so

---

[2] "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

closely related to the excessive force claim under federal law that the state claims form part of the same controversy.

Venue is proper in this judicial district based on the Defendants' residences in this judicial district, 28 U.S.C. § 1391(b)(1). Venue is also proper in this judicial district because "a substantial part of the events or omissions giving rise to the claim occurred", 28 U.S.C. § 1391(b)(2), in Maryland.

## STANDARD OF REVIEW

A motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v. Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1979); *Stevens v. Howard D. Johnson Co.*, 181 F.2d 390, 394 (4th Cir. 1950). The moving party bears the burden of showing no genuine issue as to any material fact exists. Fed. R. Civ. P. 56(a); *Pulliam Inv. Co.*, 810 F.2d at 1286 (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979)).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985). A party who bears the burden of proof on a particular claim must factually support each

element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial." *Celotex Corp.*, 477 U.S. at 323.

On those issues where the nonmoving party will have the burden of proof, it is that party's responsibility to confront the motion for summary judgment with an affidavit or other similar evidence. *Anderson*, 477 U.S. at 256. However, "'[a] mere scintilla of evidence is not enough to create a fact issue.'" *Barwick v. Celotex Corp.*, 736 F.2d 946, 958-59 (4th Cir. 1984) (quoting *Seago v. North Carolina Theaters, Inc.*, 42 F.R.D. 627, 632 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir. 1967), *cert. denied*, 390 U.S. 959 (1968)). There must be "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## DISCUSSION

*A.     Untimely Expert Designation*

Before addressing the substantive issues of Defendants' motion for summary judgment and Plaintiff's opposition thereto, Defendants object to Plaintiff's belated expert designation and request the court strike that designation. By way of background, per the May 26, 2016 scheduling order, Plaintiff's Rule 26(a)(2) expert disclosures were due *August 1, 2016*. ECF No. 22 at 2. No experts were designated by this deadline. Plaintiff never requested an extension of time to designate experts.

On December 7, 2016 Plaintiff filed his opposition to Defendants' motion for summary judgment. Two exhibits are attached to the opposition: (a) Plaintiff's December 7, 2016 Affidavit (ECF No. 30-2) and (b) a 17 page, *undated* "Expert Report/Analysis and Assessment of Liability

in Case of *Damon Wilson v. Prince George's County*," prepared by Tyrone Powers, Ph.D. (ECF No. 30-3).

Federal Rule of Civil Procedure 37(c)(1) states, in pertinent part, "[i]f a party *fails to provide information or identify a witness as required by Rule 26(a)* or (e), the party is *not allowed to use* that information or *witness to supply evidence on a motion*, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." (Emphasis added). A party need not move for sanctions to comply with Rule 26(a)(2) because Rule 37(c)(1) "provides a self-executing sanction for failure to make a disclosure. . . ." Fed. R. Civ. P. 37(c)(1) advisory committee's note to 1993 amendment.

This court has broad discretion in determining whether Plaintiff's nondisclosure was substantially justified or harmless. In making such a determination this court should be guided by the following factors: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence." *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 597 (4th Cir. 2003). No trial has been scheduled for this case. Nonetheless, this case is at the critical juncture of a dispositive motion. The court thus substitutes "disrupt the dispositive motion phase" in place of "disrupt the trial" for the third element.

Next, the court shall resolve this issue without any response from Plaintiff, who could have moved for leave to file a surreply in response to Defendants' request to strike Plaintiff's untimely expert designation. For reasons known only to Plaintiff, he did not seek leave of court or file any other motion or notice on this matter.

Based on the information presented, the court finds Defendants had no prior knowledge about Dr. Powers' expert report, analysis and assessment of liability ***until*** Plaintiff filed his opposition to Defendants' motion for summary judgment.[3] The first factor therefore is satisfied because Defendants were surprised by this untimely disclosure of Dr. Powers' report. Second, because Plaintiff did not disclose Dr. Powers' report ***until*** filing his opposition to Defendants' motion for summary judgment, Defendants did not have the opportunity to depose Dr. Powers, and did not have the opportunity to have their expert (Craig M. Dickerson) review Dr. Powers' report and opine about the basis of Dr. Powers' conclusions. Because of the unexpected, untimely disclosure of Dr. Powers' report during the dispositive motion briefing phase, Defendants do not have the ability to cure this surprise.

Third, permitting the admission of Dr. Powers' report will disrupt the dispositive motion phase because (a) the motion is ripe for resolution, and (b) Defendants did not have the opportunity to review Dr. Powers' report, consult their own expert about Dr. Powers' report, and depose Dr. Powers. Fourth, although Dr. Powers' opinion could be important, the basis of his opinion also could be unsupportable and unreliable and therefore would be excluded. The court cannot answer the fourth factor with any certainty because, due to the untimely disclosure, Defendants were not given an opportunity to scrutinize Dr. Powers' report. Finally, Plaintiff failed to provide any explanation for his untimely disclosure.

As noted in the 1993 Amendment to the Advisory Committee's Note for Rule 37(c)(1), "[t]his automatic sanction provides a strong inducement for disclosure of material that the disclosing party would expect to use as evidence, whether at a trial, at a hearing, or on a motion, such as one under Rule 56." It was incumbent upon Plaintiff, if he wanted to use Dr. Powers'

---

[3] Plaintiff disclosed the identity of his expert *before* filing his opposition to Defendants' motion for summary judgment. Plaintiff belatedly designated Tyrone Powers, Ph.D. as an expert on September 11, 2016. *See* ECF No. 39-4 at 1.

report as evidence, to comply with the scheduling order for expert disclosure or seek an extension. Plaintiff did neither. Once Plaintiff unexpectedly attached Dr. Powers' report to his opposition and Defendants, in their reply, asked this court to strike Dr. Powers' report, Plaintiff could have moved to file a surreply explaining why the disclosure was untimely or could have moved seeking other relief regarding the late disclosure of Dr. Powers' report. Plaintiff did neither.

The court therefore finds Plaintiff's untimely disclosure of Dr. Powers' report is not substantially justified nor is it harmless. The court hereby **strikes** Dr. Powers' report (ECF No. 30-3) and declines to consider his report or opinions contained therein for this motion.

B.      *Defendants' Motion for Summary Judgment*

The court now turns its attention to the substance of Defendants' motion for summary judgment. Preliminarily the court notes, in his opposition, Plaintiff abandons his negligence claim (Count Six) against Defendant PFC Gill and abandons his claim of unconstitutional custom and practice (Count Three) against Defendant Prince George's County, Maryland. *See* ECF No. 30 at 1, ECF No. 30-1 at 7. With regard to these counts Plaintiff declares,"[a]n appropriate motion to amend the complaint will soon be filed." *Id*. More than three months[4] later, no motion to amend the complaint has been filed. Accordingly, the court will dismiss the unconstitutional custom and practice claim against Prince George's County (Count Three) and the negligence claim against PFC Gill (Count Six).

The court now turns its attention to the remaining counts, *i.e.*, intentional infliction of emotional distress, battery, respondeat superior, violations of Articles 24 and 26 of the Maryland Declaration of Rights, and excessive force under 42 U.S.C. §1983.

---

[4] More than three months as of April 3, 2017.

1. *Excessive Force under 42 U.S.C. § 1983*

In Count Seven of his Amended Complaint, Wilson alleges in pertinent part:

>  44.     The shooting of the plaintiff by defendant PFC GILL, ID#3361 constituted a seizure under the Fourth Amendment of the United States Constitution;
>
>  45.     The defendant PFC GILL, ID#3361 maliciously, and without legal justification, under color of Maryland State law, shot, with a firearm, the plaintiff, and thereby used unreasonable and excessive force in performing the aforesaid seizure of the plaintiff, depriving [him] of [his] rights under the Fourth Amendment of the Constitution of the United States, to be free from unreasonable seizures, including excessive force;
>
>  46.     The aforesaid shooting, harmful and/or offensive intentional touchings of the plaintiff, without the plaintiff's consent, caused the plaintiff physical pain and/or injury or illness, and offended the plaintiff's reasonable sense of personal dignity;
>
>  47.     As a direct, foreseeable, and proximate result of the deprivation of the plaintiff's rights under the Fourth Amendment, the plaintiff sustained the injuries, alleged above;
>
>  48.     The aforesaid shooting was performed with malice toward the plaintiff, with intent to inflict injuries, with improper motivations, and/or with ill will;
>
>  49.     As a proximate and foreseeable result of the aforesaid battery, the plaintiff sustained the injuries, alleged above[.]

ECF No. 35 at 6.

In their Answers to the Amended Complaint, Defendants admit paragraph 44, the shooting of Wilson by PFC Gill constitutes a seizure under the Fourth Amendment of the United States Constitution. As to the remaining allegations, with the exception of admitting Wilson was partially paralyzed (paras. 46-47, 49), Defendants deny the allegations (paras. 45 and 48), or deny portions of the allegations and assert a lack of sufficient information or knowledge to admit or deny other portions of the allegations (paras. 46-47, 49). *See* ECF No. 36 at 5-6.

A cause of action is created under Section 1983 of Title 42 against any person acting under color of state law who abridges an individual's right arising under the Constitution or laws of the United States. *Cooper v. Sheehan*, 735 F.3d 153, 158 (4th Cir. 2013). Plaintiff and Defendants agree the shooting of Wilson by PFC Gill constitutes a seizure under the Fourth Amendment. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding "that *all* claims that law enforcement officers have used excessive force - - deadly or not - - in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the <u>*Fourth Amendment*</u> and its 'reasonableness' standard. . . .").

In response to a Section 1983 claim a government official may invoke qualified immunity. Qualified immunity is not merely a defense to liability; it is immunity from the lawsuit itself. *Cooper*, 735 F.3d at 158. "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Therefore, qualified immunity shields a police officer from civil liability unless, under a reasonableness inquiry, the police officer should have known his actions violated clearly established constitutional rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. This reasonableness inquiry is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397. In assessing the reasonableness of the force used to effect a particular seizure, a court must carefully consider the

facts and circumstance of the particular case, especially the following three factors: (a) "the severity of the crime at issue," (b) "whether the suspect poses an immediate threat to the safety of the officers or others, and" (c) "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. Finally, the United States Court of Appeals for the Fourth Circuit cautions "[a] court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996).

Turning to the facts and circumstances of this case, Wilson appears to concede the first factor (the severity of the crime at issue) is established. However Wilson asserts the second and third factors have not been met. "In the instance case, the plaintiff posed no threat to the safety of the officer or others, and was not actively resisting arrest or attempting to evade arrest by flight." ECF No. 30-1 at 3.

With regard to the first factor Wilson acknowledges that, in response to Johnson's 911 call, PFC Gill was dispatched to Johnson's apartment building. Although Wilson was not present when the 911 call was made, Wilson knew Johnson attempted to call the police, which he prevented.

> Q    Describe what occurred once you got to the apartment building.
>
> A    Detailed?
>
> Q    Yes, sir.
>
> A    When I went to the apartment building, I'm knocking on the door, banging on the door. I was, like, "Mynia, I want to see [N]. I want to see [N]," and she kept on ignoring me and I kept on yelling, "Let me see [N], let me see [N]," and then I heard my daughter's [voice]. "Daddy, daddy." I was, like, "Oh, man," Then like, you know, I guess I got too mad and I kicked the door down.

     *       *       *

  [Q]  and you were kicking it backwards or were you kicking it while you were facing the apartment door?

  A  Back turned.

  Q  Okay. And once you kicked down the door, what happened?

  A  I walked in, started cussing. I can't say exactly what I said, but I know I started cussing and I started cussing at Bert and I found myself getting too mad and I left.

     *       *       *

  Q  And once you walked out, what occurred?

  A  Mynia Johnson followed me right behind me and I - - she followed me all the way around the corner - - I can't tell you which corner - - and followed me, you know, about - - I can't remember exactly what she did but, you know, she kept on just provoking me, you know, and I did - - I didn't punch her, but I did slap her.

    You know, didn't really mean to. It was just reflexes and I said - - I remember saying I'm sorry. She said she was going to call the police. Snatched the phone, it fell down the drain. I left and I went over my twin brother's house.

ECF No. 29-1 at 12, 13, 15 (Wilson Dep. 64:8-19, 66:1-9, 69:3-14).

  In her October 7, 2012 Statement of Victim, Johnson corroborates the facts and circumstances resulting in the dispatch of PFC Gill to Johnson's apartment building.

  Damon came to my door and kicked it down[.] [W]hen walking outside he threw my phone down the drain . . . He knocked on the door, then started kicking it and kicked the lock off the door . . . Then Damon walked out and I followed him to calm him down[;] he started yelling at me and took my phone out [of] my hand and threw it down the drain. He started running and I followed him then we stopped . . . Then he hit me in my left eye[.] I walked away to go back to the house and he kept walking. When I got to the house I called the police again.

ECF No. 29-2 at 3, 4. Later in her statement, in response to a question, "[h]ow did Damon hit you?" Johnson answered, "closed fist and hit me once on the left side next to my eye." *Id.* at 9.

The Internal Affairs Division of the Prince George's County, Maryland Police Department investigated the shooting of Wilson. PFC Gill was interviewed on July 3, 2013, approximately nine months after the incident. PFC Gill explained the nature of the call he received from a police dispatcher to report to Johnson's apartment building. "I responded there for a domestic. It was given to us via 911. A female victim called 911 stating her ex-boyfriend had broke[n] into her apartment while she was in there, beat her, um, and then fled out of the apartment." ECF No. 29-3 at 4. Johnson apparently observed PFC Gill arrive in a marked vehicle and met him in the parking lot.

> She came and approached me in my car; stated that her ex-boyfriend had beat[en] her, uh, after breaking into her apartment and then he fled the area. So I discussed with her what happened; tried to get some further details, get the information on the suspect . . . She then, um, advised there's damage to her door so for, uh, my report since the suspect had left I said well ma'am why don't you show me your door so I can just verify if there's any damage to it. I walked inside the building, walked up both flight of stairs, looked at her door, saw it was, uh, damage was done to it.

*Id.*

The facts establish Wilson assaulted[5] his ex-girlfriend, broke and entered into her apartment, and maliciously destroyed her cellphone. Based on this conduct, Wilson could have been charged with battery,[6] burglary — fourth degree (break and enter dwelling),[7] and malicious destruction of property.[8]

---

[5] "'Assault' means the crimes of assault, battery, and assault and battery, which retain their judicially determined meanings." Md. Code Ann., Crim. Law § 3-201(b) (Lexis Nexis 2012 Repl. Vol.).

[6] "Assault is causing offensive physical contact to another person. In order to convict the defendant of assault, the State must prove:

Individually, each crime is a misdemeanor. *See* Md. Code Ann., Crim. Law §§ 3-203(b)[9], 6-205(e)[10], 6-301(c)[11], but collectively, these crimes reflect a severe level of lawlessness warranting apprehension and arrest. Wilson's crimes are not comparable to an individual pocketing a lost five dollar bill. *Rowland v. Perry*, 41 F.3d 167, 174 (4th Cir. 1994) (finding "[w]hen all the factors are considered *in toto*, it is impossible to escape the conclusion that a man suffered a serious leg injury over a lost five dollar bill. There is no dispute here that the offense

---

(1) that the defendant caused [offensive physical contact with] (Mynia Johnson);
(2) that the contact was the result of an intentional or reckless act of the defendant and was not accidental; and
(3) that the contact was [not consented to by (Mynia Johnson)]."

Maryland Pattern Jury Instruction – Criminal ("MPJI-Cr") 4:01(C) Second Degree Assault: Battery (2013).

[7] "The defendant is charged with the crime of burglary in the fourth degree. Burglary in the fourth degree is the breaking and entering of someone else's dwelling. In order to convict the defendant of burglary in the fourth degree, the State must prove:
(1) that there was a breaking;
(2) that there was an entry;
(3) that the breaking and entry was into someone else's dwelling; and
(4) that the defendant was the person who broke and entered [.]

\*                              \*                              \*

Breaking means the creation or enlargement of an opening, such as breaking or opening a window or pushing open a door. [Breaking includes gaining entry by fraud, trick, or force.] Entry means that any part of the defendant's body was inside the dwelling. A dwelling is a structure where someone regularly sleeps."

MPJI-Cr 4:06.3 Burglary — Fourth Degree (Break and Enter Dwelling) (2013).

[8] "The defendant is charged with the crime of malicious destruction of property. In order to convict the defendant of malicious destruction of property, the State must prove:
(1) that the defendant damaged, destroyed, or defaced someone else's property; [and]
(2) that the defendant acted with the intent to damage, destroy, or deface that property[.]"

MPJI-Cr 4:20 Malicious Destruction of Property (2013).

[9] "Except as provided in subsection (c) of this section, a person who violates subsection (a) of this section is guilty of the misdemeanor of assault in the second degree and on conviction is subject to imprisonment not exceeding 10 years or a fine not exceeding $2,500 or both."

[10] "A person who violates this section is guilty of the misdemeanor of burglary in the fourth degree and on conviction is subject to imprisonment not exceeding 3 years."

[11] "A person who, in violation of this section, causes damage of less than $500 to the property is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 60 days or a fine not exceeding $500 or both."

was a minor one, not as serious as pickpocketing or purse[-]snatching. At worst, Rowland picked up a five dollar bill that he knew had been lost by someone else."). The first factor under *Graham* is established.

Next, in assessing the reasonableness of PFC Gill's force, this court must determine whether Wilson posed an immediate threat to the safety of PFC Gill or others. Wilson refutes any suggestion that he posed an immediate threat to the safety of PFC Gill or the bystanders. Instead, Wilson was a threat to *himself* and executed on that threat by inflicting himself with wounds with the knife he held in his hand.

> Q      Going back, once you grabbed the pocket knife, you started walking back towards Ms. Johnson's apartment, correct?
>
> A      Yes.
>
> Q      And did you know that she lived at that apartment before that day?
>
> A      Yes.
>
> Q      Okay. Tell us what occurred, then, once you started walking back.
>
> A      When I was walking, I seen the police out there and Mynia, she's probably like - - I can't remember exact, but she was closer to me than the police officer, and I remember I was walking and they was [sic] outside, and I remember the police officer seen the knife in my hand and I stopped because I heard him say "stop," so I stopped and he was like 20 feet away.
>
> I started cussing, started poking myself, about to slit my throat and, like, I remember her crying and yelling and, you know, the police officer[] w[as] saying, "Put the knife down." And I kept on poking myself and I remember that one poke it really hurt really bad and I, like, it hurt I stumbered. Stumbered, that's how you say it? Stumbered?
>
> Q      Stumbled.

> A        Stumbled. Like, took like four little small steps and that's when he shot me.

ECF No. 29-1 at 25-26 (Wilson Dep. 90:9 – 91:13).

When Wilson picked up the pocket knife at his brother's home, he wanted to commit suicide and do so in front of Johnson to let her know she was at fault for the present circumstances. *Id.* at 23-24 (Wilson Dep. 86:18 – 87:3). When Wilson encountered PFC Gill he did not mention he was attempting to commit suicide. *Id.* at 33 (Wilson Dep. 104:3-8). Wilson provided additional details about the sequence of events when he encountered PFC Gill.

> [Q]      either poking yourself in the chest or trying to cut your throat?
>
> A        I remember him saying, "Drop the knife."
>
> Q        Okay.
>
> A        That's the only thing I remember.
>
> Q        And, at that point, is that when you stopped walking or did you stop walking when you saw the police officer?
>
> A        I stopped walking when he pulled the gun out.
>
> Q        Okay. All right. And you never moved after that?
>
> A        Like what I said, you know, when I stabbed myself, I stumbled like four times. Like, you know, four little small steps stumble.
>
> *                              *                              *
>
> Q        You just stumbled like four steps forward?
>
> A        Yes.
>
> Q        Okay. And that's when the police officer shot you?
>
> A        Yes.

Q      Okay. And you said you were 20 feet away when the officer told you to stop?

A      About 20 feet, yeah.

Q      About 20 feet?

A      Yes.

Q      Okay. Once he told you to stop, you stopped at that point. That's when you started poking yourself in the chest and trying to cut your throat?

A      Yes.

Q      Okay. And then once - - you said at one point one of the pokes really hurt. You took four - - you stumbled about four little steps and that's when you were shot?

A      Yes.

*Id.* at 30, 31-32 (Wilson Dep. 101:1-15, 102:7 – 103:4). In summary, according to Wilson, he did not pose an immediate threat to PFC Gill or others on the scene. Although Wilson held a pocket knife in his hand, he stopped approximately 20 feet away from PFC Gill who had his service weapon drawn. After stopping, Wilson began poking himself with the knife. One of those self-inflicted lacerations was rather painful, and Wilson reacted by stumbling, taking four little steps in the direction of PFC Gill, who reacted by firing his service weapon.

PFC Gill describes the sequence of events culminating in the firing of his service weapon as follows:

> While leaving the apartment building and walking up the sidewalk a male had came [sic] around the corner of a far building and that, uh draw [sic] [Mynia Johnson's] attention. She immediately said that's him, that's him. I said okay. Why don't you go back inside the building while I go talk to him. So I went down the pathway towards the apartment building. He had came [sic], uh, and continued to walk towards me. I tried to talk to him. I said hey, how are you? What's going on? What's your name? He was ignoring what I was saying. He then puts his hands in his pocket

and pulled out an object. I couldn't recognize what that object was at first. There was a great distance between the two of us. I immediately recognized that it was something shiny but I didn't know what it was. He then continued to walk towards me. I drew my gun and I started giving him verbal commands. I told him ten, 15 times whatever it is drop whatever you have in your hands. He wasn't listening. He got about 40 feet away from me and I recognized that to be a knife. As soon as I saw that it was a knife I got on the radio and I was a very unhappy camper. I requested more units. I said what I have. I, um, advised communications there's an individual – the suspect has returned and he's armed with a knife. He stopped walking and was trying to give me commands. So we're 40 feet apart approximately. And he's telling me I'm not gonna drop the knife but you need to go away. Let me do what I wanna do. To my response was no, you need to drop the knife. I'm not going anywhere. He took three or four steps forward and slit his throat. Um, I continued to give him verbal commands. I told him drop the knife, this isn't worth it. I tried to reason with him. I tried to talk to him. He didn't wanna have anything to do with me. After he slit his throat he walked a couple more steps forward and stabbed himself in the chest. At that point he's closing the distance. He's 25, 30 feet away from me. I'm continuing to yell at him drop the knife, drop the knife. There's family members that are family behind me. The female victim – the caller she's standing behind me. Her family's behind me. They – I'm trying to tell them go inside. I can't go anywhere because I'm in front of this apartment building door and if I move back any f[a]rther he can run inside of an apartment and I'm – I – that just wasn't an option. So he's closing - he's walking towards me. They're not listening to me; they're behind me. I'm telling this – the individual to drop the knife and he won't. And then he closed the distance and he was too close. He was ten – in my mind he was ten, 15 feet away from me. I had no other options. I – I discharged my firearm. I – I had nowhere to go. The family was behind me. He was not listening to what I was telling him to do. I – I had to.

ECF No. 29-3 at 4-5 (Gill Aff.). PFC Gill was questioned further about Wilson "slitting" his throat.

Q:      Now you made a comment that he slit his throat. What did – what do you mean by slitting his throat?

A:      I saw the knife. He moved – put it up to his neck. He moved laterally from left to right. And screamed in pain.

Q:      He was making motions that he was cutting his own throat.

A:      Correct. Th- th- he was far enough away – I mean I wasn't close enough to see, uh, the depth of the wound or I – I just – from his body language, from his motions, from his, um, him screaming in pain I – I recognized that to be an action of somebody slitting their throat.

*Id.* at 8.

The only other individual at the scene who provided a statement is Johnson. After writing her statement, a police officer asked her a series of questions, including the following:

Q30:    What did you tell the officer when you saw Damon?

R30:    I pointed [D]amon out [to] the officer, then I said "there he go[es]." The[n] [D]amon pulled out the knife and tried to cut his throat, and stab hi[m]self in the chest.

Q31:    What did the officer do?

R31:    He told him [to] put the knife down after he tried to cut his throat then once again after he tried to stab hi[m]self in the chest.

Q32:    How far were you from Damon?

R32:    [A]bout 9 to 10 ft.

Q33:    How far was the officer from Damon?

R33:    8 ft.

ECF No. 29-2 at 12-13 (Johnson Statement).

Based on the testimonies above, it is undisputed that Wilson used the knife to harm himself. No evidence has been presented that Wilson attempted to threaten or harm PFC Gill or others with the knife. These facts however do not support Wilson's contention that he did not pose an immediate threat to the safety of PFC Gill or others. Wilson ignores what else was occurring.

It is undisputed that PFC Gill told Wilson to put the knife down. Wilson ignored this verbal command, despite being told multiple times. Moreover, Wilson continued moving toward PFC Gill whose gun was drawn. Wilson claims he was approximately 20 feet away when PFC Gill shot him. However, PFC Gill believed Wilson was 10 to 15 feet away. Johnson, standing behind PFC Gill, claims Wilson was approximately 9 to 10 feet away from her, but was 8 feet away from PFC Gill.

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - - in circumstances that are tense, uncertain, and rapidly evolving - - about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 455-56. At the moment force was used, PFC Gill knew:

   a.      Wilson broke and entered into Johnson's apartment;

   b.      Wilson struck Johnson in the face;

   c.      Wilson held a knife in his hand as he approached PFC Gill;

   d.      Wilson continued holding the knife despite commands to drop it;

   e.      Wilson continued walking toward PFC Gill even though PFC Gill's gun was drawn;

   f.      Johnson and others stood behind PFC Gill despite his directions to leave the scene;

   g.      PFC Gill, standing in front of the apartment building door, could not move back any farther without allowing Wilson to run inside of an apartment;

   h.      PFC Gill considered less lethal force but he did not have a Taser;

   i.      PFC Gill eliminated the use of pepper spray as not effective and he eliminated the use of his baton since it would put him at a disadvantage;

j.      Wilson was harming himself with the knife; and

k.      Wilson moved or stumbled within 8 to less than 20 feet of PFC Gill.

Although Wilson argues his stumbling toward PFC Gill by taking four small steps after cutting himself with a knife did not pose an immediate threat to the safety of PFC Gill or other bystanders, in light of the facts known to PFC Gill at the moment force was employed, the court finds a reasonable officer would have perceived Wilson's movement as threatening. *See Njang v. Montgomery County*, 279 F. App'x 209, 214 (4th Cir. 2008) ("It seems eminently reasonable that Officer Marchone believed that Njang, advancing upon her with a box cutter despite her commands to drop it, 'pose[d] a significant threat of death or serious physical injury' to her.") (citation omitted). The following colloquy between Sergeant Pham of the Internal Affairs Division and PFC Gill focuses upon the moment force was employed.

> Q:      [S]pecifically, why did you discharge your firearm?
>
> A:      I was in fear for my life as well as the individuals that were behind me.
>
> Q:      Now did you consider using less lethal force?
>
> A:      I did and I had nothing available. My pepper spray was not effective. My baton would've put me at a disadvantage. And I don't have a Taser.
>
> Q:      And how many times did you discharge your weapon?
>
> A:      Five.

ECF No. 29-3 at 11 (Gill Aff.). Defendants' expert witness Craig M. Dickerson, a Montgomery County police officer and trainer in the use of force, opined the level of force employed by PFC Gill was reasonable.

> Facing a deadly weapon [within 10 feet], PFC Gill could not resort to a less than lethal force option such as a Baton or Taser.[12] PFC [Gill] had attempted the first option on the [u]se of force continuum which was verbal commands with negative results. Even at 10 feet, the chances that the Officer will get cut and the suspect will be shot are even. Placement of the knife cut and the bullet impact will determine who survives. At this distance, PFC Gill with Mr. Wilson closing the gap and defenseless civilian witnesses who PFC Gill is sworn to protect had no other options than to discharge his firearm to stop what he believed to be a threat of death or serious bodily harm to himself and the witnesses who were standing outside in a vulnerable position.

ECF No. 29-4 at 11 (Dickerson Report).

The facts and circumstances of this case are not analogous to *Cooper*, where the Fourth Circuit affirmed a district court's denial, at the summary judgment stage, of the invocation of qualified immunity by the Officers against Cooper's Section 1983 excessive force claims. In that case the Fourth Circuit found,

> When the Officers fired on Cooper, he stood at the threshold of his home, holding the shotgun in one hand, with its muzzle pointed at the ground. *He made no sudden moves. He made no threats. He ignored no commands.* The Officers had no other information suggesting that Cooper might harm them. Thus, the facts fail to support the proposition that a reasonable officer would have had probable cause to feel threatened by Cooper's actions.

735 F.3d at 159 (emphasis added).

Wilson describes his conduct as a suicide attempt. Although Wilson was harming himself with the knife, the facts and circumstances of this case are not similar to *Connor v. Thompson*, 647 F. App'x 231 (4th Cir. 2016). Wilson claims the Fourth Circuit found a suicidal man holding a knife did not pose an immediate threat to the safety of police officers or others. The Fourth Circuit's pronouncement is not as broad as Wilson characterizes. Instead the Fourth Circuit held, "[n]o reasonable officer could think a suicidal, *non-criminal* individual holding a small paring

---

[12] Dickerson apparently forgot that PFC Gill did **not** have a Taser on him.

knife and otherwise *acting in a nonthreatening manner* who had *difficulty standing and walking* presents justification to deviate from [a] bright-line proscription [to limit deadly force to situations when the police officer has probable cause to believe a suspect poses a significant threat of death or serious physical injury to the officers or others]." *Id.* at 239 (emphasis added).

Unlike the decedent in *Connor*, in this case, Wilson was a suspect (in light of his breaking and entering into Johnson's apartment as well as battering her). He had no trouble walking or standing; in fact, Wilson continued approaching PFC Gill, with gun drawn, despite commands to drop the knife. Based on what PFC Gill knew at the moment force was employed, this court concludes PFC Gill reasonably perceived a threat to his safety and the safety of the three individuals standing behind him. PFC Gill's response thus was "objectively justified and reasonable." *Sigman v. Town of Chapel Hill*, 161 F.3d 782, 787 (4th Cir. 1998). What the *Sigman* court noted is equally applicable to this case: "[w]here an officer is faced with a split-second decision in the context of a volatile atmosphere about how to restrain a suspect who is dangerous, who has been recently - - and potentially still is - - armed, and who is coming towards the officer despite officers' commands to halt, we conclude that the officer's decision to fire is not unreasonable." *Id.* at 788.

The third *Graham* factor is "whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396. Wilson contends he was neither actively resisting arrest nor attempting to evade arrest by flight. The uncontroverted evidence demonstrates Wilson moved toward PFC Gill instead of fleeing the scene. Although Wilson was not actively resisting arrest, he was, at a minimum, "actively resisting submitting to the officer's control." *Minor v. Prince George's County*, Case No. PWG-15-983, 2017 U.S. Dist. LEXIS 21816, at *29 (D. Md. Feb. 15, 2017). Like the decedent in *Njang*, Wilson ignored the

commands of a uniformed police officer to drop the knife. Instead Wilson continued moving toward PFC Gill with the knife in his hand approaching within 8 to less than 20 feet. *Njang*, 279 F. App'x at 214. At the moment PFC Gill used lethal force, he felt threatened by Wilson and feared for his safety and for the safety of the individuals standing behind him. "[A] reasonable officer possessing the same information *could* have believed that [use of deadly force] was lawful." *Minor*, 2017 U.S. Dist. LEXIS 21816, at *29 (quoting *Slattery v. Rizzo*, 939 F.2d 213, 216 (4th Cir. 1991)).

The court finds the evidence of record establishes, as a matter of law, that PFC Gill's use of deadly force against Wilson was reasonable, justified, and authorized by law. PFC Gill thus has met his burden of proving qualified immunity. Wilson has not identified any facts supporting his position that PFC Gill's actions were unjustified. Summary judgment in PFC Gill's favor and against Wilson as to the § 1983 claim (Count Seven) is proper.

> 2.    *State Constitutional Claim*

In Count One of his Amended Complaint Wilson alleges in pertinent part,

> 13.    The aforesaid apprehension, shooting, and battery of the plaintiff by the defendant PFC GILL, ID#3361 constituted a seizure under Articles 24 and 26 of the Maryland Declaration of Rights ("MDR");
>
> 14.    The defendant PFC GILL, ID#3361 used unreasonable and excessive force in performing the aforesaid seizure of the plaintiff, violating the plaintiff's rights under MDR Articles 24 and 26;
>
> 15.    The defendant PFC GILL, ID#3361 committed the acts alleged above with malice, hatred, and/or ill will, and without legal justification[.]

ECF No. 35 at 2.

Article 24 of the Maryland Declaration of Rights is the analogue to the Fourteenth Amendment to the United States Constitution and Article 26 is Maryland's analogue to the

Fourth Amendment. *Randall v. Peaco*, 175 Md. App. 320, 330, 927 A.2d 83, 89 (2007), *cert. den.* 401 Md. 174, 931 A.2d 1096 (2007). A claim of excessive force under Article 24 is analyzed identically to a claim of excessive force under Article 26. "In both instances, the claim is assessed under *Fourth Amendment* jurisprudence, rather than notions of substantive due process, precisely like the analysis employed for claims brought under 42 U.S.C. § 1983." *Id.* Consequentially, "[t]he test for determining the objective reasonableness of the officer's conduct for purposes of deciding a claim of excessive force brought under the state constitution is the test the Supreme Court announced in *Graham*." *Id.* This court has already found PFC Gill's conduct was objectively reasonable under § 1983. Wilson's claims under the Maryland Declaration of Rights therefore fail for the same reason his § 1983 claim failed. Summary judgment in favor of PFC Gill and against Wilson as to Count One is proper.

3.    *Battery & Intentional Infliction of Emotional Distress*

Wilson alleges the attack, seizure, apprehension, and shooting constitute harmful and/or offensive touchings, without Wilson's consent, causing Wilson physical pain, and offending Wilson's reasonable sense of personal dignity. ECF No. 35 at 5 ¶ 32. Wilson further claims the attack, seizure, apprehension, and shooting were performed with malice toward him, with intent to inflict injuries, or with ill will and/or with improper motivations. *Id.* ¶ 33. This court has determined the use of force by PFC Gill was reasonable. "Because the use of force was objectively reasonable, any state law claim for assault or battery would also fail." *Holloman v. Rawlings-Blake*, Civil No. CCB-14-1516, 2015 U.S. Dist. LEXIS 95362, at *16 n.11 (D. Md. July 22, 2015), *aff'd sub nom. Holloman v. Markowski*, 661 F. App'x 797 (4th Cir. 2016). PFC Gill thus is entitled to summary judgment on this claim for battery (Count Four).

In his claim alleging intentional infliction of emotional distress, Wilson alleges PFC Gill's conduct was intentional and/or reckless and performed with malice, hatred, ill will or gross disregard for Wilson's rights. ECF No. 35 at 5 ¶ 36. Additionally Wilson characterizes PFC Gill's conduct as extreme and outrageous. *Id.* ¶ 37. Wilson then contends PFC Gill's conduct proximately and foreseeably caused his severe emotional distress. *Id.* ¶ 38.

A necessary element of an intentional infliction of emotional distress claim is the assertion that PFC Gill's conduct was extreme and outrageous. This court has determined that PFC Gill's actions were objectively reasonable. As a matter of law Wilson's intentional infliction of emotional distress claim against PFC Gill must fail. PFC Gill therefore is entitled to summary judgment on this claim (Count Five).

4. *Respondeat Superior*

Finally, under Count Two, Wilson alleges in pertinent part,

> 18.  At all relevant times, the defendant PFC GILL, ID#3361, was acting within the scope of the defendant's employment with PRINCE GEORGE'S COUNTY, MARYLAND, as a Police Officer, at the time he committed the acts alleged above;

> 19.  At all relevant times, the defendant PRINCE GEORGE'S COUNTY, MARYLAND, had selected and engaged for employment PFC GILL, ID#3361, had paid his wages, possessed the power to dismiss him from employment, and possessed the power to control his conduct;

> 20.  At all relevant times, the aforesaid defendants committed all of the acts alleged above with the express and/or implied authorization of the defendant PRINCE GEORGE'S COUNTY, MARYLAND;

> 21.  As a proximate and foreseeable result of the aforesaid acts, which were committed by the defendant PFC GILL, ID#3361, while acting within the scope of the defendant's employment and duties as a police officer for the defendant

PRINCE GEORGE'S COUNTY, MARYLAND, the
plaintiff suffered injuries, alleged above[.]

ECF No. 35 at 3. In their Answers[13] to the Amended Complaint Defendants admit "Officer Gill was a police officer employed by Prince George's County, Maryland, within its police department on the date of the occurrence alleged." ECF No. 36 at 3 (Am. Answers ¶¶ 19, 20, 21). Further Defendants assert multiple affirmative defenses including immunity from liability asserted. Additionally Defendants contend Wilson's claims and the extent of damages are barred or limited by the Local Government Tort Claims Act, common law, or other immunities. *Id.* at 6.

In their motion for summary judgment Defendants assert respondeat superior cannot be asserted as a separate cause of action. "*Respondeat superior* . . . is a doctrine that permits the imputation of liability on a principal or employer for the act of an agent or employee." *Davidson-Nadwodny v. Wal Mart Assocs.*, No. CCB-07-2595, 2008 U.S. Dist. LEXIS 45633, at *15-16 (D. Md. June 3, 2008). In his opposition Wilson declares "as a matter of common law, local governmental entities do have respondeat superior liability for civil damages resulting from State Constitutional violations committed by their agents and employees within the scope of the employment." ECF No. 30-1 at 7 (citing *Prince George's County v. Longtin*, 419 Md. 450 (2011)). In their reply Defendants note Wilson did not allege any constitutional violation against Prince George's County. ECF No. 31 at 9.

In his Amended Complaint Plaintiff asserts a common law tort (negligence), intentional torts (battery[14] and intentional infliction of emotional distress[15]), and a state constitutional tort

---

[13] Defendants served their Answers on *March 3, 2017, see* ECF No. 36, after the undersigned issued an Order directing supplementation of the record, specifically, the filing of the Amended Complaint and the filing of Defendants' Answers to the Amended Complaint. *See* ECF No. 34. It appears to the undersigned that Defendants *never* served Answers to the Amended Complaint *until* the undersigned requested proof.

[14] "A battery is the intentional touching of a person without that person's consent. Touching includes the intentional putting into motion of anything that touches another person, or that touches something that is connected with, or in contact with, another person. To be a battery, the touching must be harmful or offensive. A touching is harmful if it

(violation of Article 24 and 26 of the Maryland Declaration of Rights). In his capacity as a Prince George's County police officer, purportedly enforcing the State criminal law, PFC Gill's actions were governmental in nature with regards to the common law tort of negligence. *See DiPino v. Davis*, 354 Md. 18, 47, 729 A.2d 354, 369-70 (1999) ("A local governmental entity is liable for its torts if the tortious conduct occurs while the entity is acting in a private or proprietary capacity, but, unless its immunity is legislatively waived, it is immune from liability for tortious conduct committed while the entity is acting in a governmental capacity."). It is undisputed that PFC Gill was acting within the scope of employment when he encountered Wilson on October 7, 2012. *See* ECF No. 36 at 3 (Am. Answers ¶ 18[16]).

For the intentional torts of battery and intentional infliction of emotional distress, governmental immunity does not apply. *See id.* at 49, 792 A.2d at 370 ("a police officer, who might otherwise have the benefit of [governmental] immunity, does not enjoy it if the officer commits an intentional tort or acts with malice."). Because this court determined PFC Gill's use of force was reasonable, Wilson's claim for battery fails. *See supra*. Moreover, because Wilson does not demonstrate PFC Gill's conduct was extreme or outrageous, Wilson fails to establish a necessary element for intentional infliction of emotional distress. Therefore, *respondeat superior*

---

causes physical pain, injury, or illness. A touching is offensive if it offends the other person's reasonable sense of personal dignity."
Maryland Civil Pattern Jury Instruction 15:2 (2017).

[15] "A defendant whose conduct is intentional or reckless and is extreme and outrageous and that causes the plaintiff severe emotional distress is liable for damages caused by that conduct.
    For conduct to be intentional or reckless, the defendant must either:
        (1) desire to inflict severe emotional distress, or
        (2) know that such distress is substantially certain to result in such conduct, or
        (3) act recklessly in deliberate disregard of a high degree of probability that emotional distress will follow.
*Id.* § 15:12.

[16] Defendants admit, "[a]t all relevant times, the defendant PFC GILL, ID #3361, was acting within the scope of the defendant's employment with PRINCE GEORGE'S COUNTY, MARYLAND, as a Police Officer, at the time he committed the acts alleged above[.]" ECF No. 35 at 3 (2nd Am. Compl. ¶ 18).

liability is not relevant since Wilson cannot establish PFC Gill committed the intentional torts of battery and intentional infliction of emotional distress.

Finally, with regard to the constitutional tort purportedly committed by PFC Gill against Wilson, Plaintiff correctly argues no governmental immunity exists. "[N]either the local government official nor a local governmental entity has available any governmental immunity in an action based on rights protected by the State Constitution." *DiPino*, 354 at 51, 729 A.2d at 371. In other words, as the Court of Appeals of Maryland unequivocally stated,

> [A]s a matter of common law, that local governmental entities do, indeed, have *respondeat superior* liability for civil damages resulting from State Constitutional violations committed by their agents and employees within the scope of the employment.

*Id.*, 354 Md. at 51-52, 729 A.2d at 372. This court did not find any State Constitutional violations by PFC Gill against Wilson. *See supra*. Without such violations, *respondeat superior* liability for civil damages is unavailable as a remedy to Wilson. Accordingly, the court will dismiss Count Two (respondeat superior) against Prince George's County.

## CONCLUSION

For the foregoing reasons, the court finds there are no genuine issues as to any material fact and Defendants are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Memorandum Opinion of April 3, 2017 and its accompanying Order will be vacated. An Amended Order will be entered separately.


  June 23, 2017                     _____/s/_____
       Date                               WILLIAM CONNELLY
                                   UNITED STATES MAGISTRATE JUDGE